UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| ANDREW C. CURTIN, Individually and as Personal Representative of the Estate of CYNTHIA CARTWRIGHT, | ) ) ) ) | |
| Plaintiff | ) ) | |
| v. | ) ) | No. 2:24-cv-00427-LEW |
| JOHNSON & JOHNSON and PECOS RIVER TALC, LLC, | ) ) ) | |
| Defendants | ) ) | |

## <u>ORDER ON FED. R. EVID. 702 MOTIONS AND RELATED MOTIONS</u>

The matter is before the Court on the following motions to exclude expert testimony, to strike from the record motion-related disclosures or exhibits, to conduct *de bene esse* depositions, and to allow certain surreply briefs:

A. Defendants' Motion in Limine to Exclude the Opinions of Dr. Godleski (ECF No. 73) and Memorandum in Support (ECF No. 86). *See also* Plaintiff's Response (ECF No. 105); Defendants' Reply (ECF No. 116).

B. Plaintiff's Motion to Exclude Cumulative and Irrelevant Expert Opinion Testimony (ECF No. 75). *See also* Defendants' Response (ECF No. 103); Plaintiff's Reply (ECF No. 111).

C. Plaintiff's Motion to Exclude Expert Causation Opinions Related to Cynthia Cartwright's Worksites (ECF No. 78). *See also* Defendants' Response (ECF No. 104); Plaintiff's Reply (ECF No. 114).

D. Plaintiff's Motion to Exclude Expert Testimony of Dr. Matthew Sanchez (ECF No. 81). *See also* Defendants' Response (ECF No. 102); Plaintiff's Reply (ECF No. 115).

E.  Defendants' Motion to Exclude Expert Opinions of Mr. Sean Fitzgerald (ECF No. 83) and Memorandum in Support (ECF No. 83-1).  *See also* Plaintiff's Opposition (ECF No. 106); Defendants' Reply (ECF No. 117).

F.  Defendants' Motion to Exclude Certain Opinions of Dr. David Madigan (ECF No. 82).  *See also* Plaintiff's Response (ECF No. 101); Defendants' Reply (ECF No. 112).

G.  Defendants' Motion to Strike (ECF No. 118).  *See also* Plaintiff's Opposition (ECF No. 123); Defendants' Reply (ECF No. 132).

H.  Plaintiff's Motion for Leave to Conduct De Bene Esse Depositions (ECF No. 122).  *See also* Defendants' Opposition (ECF No. 134); Plaintiff's Reply (ECF No. 139).

I.  Plaintiff's Motions for Leave to File Surreplies (ECF Nos. 119, 120, 124), which are GRANTED.

These motions are decided on the briefs.  The parties' requests for pretrial hearings on their motions are denied.

## RULE 702 STANDARDS

Rule 702 of the Federal Rules of Evidence provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.  As indicated, Rule 702 places conditions on the admissibility of expert opinion testimony and requires district judges to act as gatekeepers, ensuring that the expert's proffered testimony "rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 594-97 (1993).  But "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system."  Fed. R. Evid. 702 Advisory Committee Notes to 2000 Amendments (quoting *United States v. 14.38 Acres of Land Situated in Leflore County, Miss.*, 80 F.3d 1074, 1078 (5th Cir. 1996)).  The rejection of expert testimony is the exception rather than the rule.  *Id.*  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

Long has it been understood that the admissibility of expert opinion testimony is primarily a question of utility.  *See* Fed. R. Evid. 702 Advisory Committee Note to 1972 Proposed Rules ("Whether the situation is a proper one for the use of expert testimony is to be determined on the basis of assisting the trier.").[1]  Generally, weaknesses in the factual underpinnings of an opinion do not require its exclusion; issues of weight and credibility generally are matters for the fact finder's consideration, unless it is apparent that the opinion is tethered to the facts only by the say so of the expert. *Gen. Elec. Co. v. Joiner*,

---

[1] "There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." Fed. R. Evid. 702 Advisory Committee Notes to 1972 Proposed Rules (quoting Ladd, Expert Testimony, 5 Vand.L.Rev. 414, 418 (1952)).

522 U.S. 136, 146 (1997). Still, it is incumbent upon the trial judge to "decide any preliminary question about whether a witness is qualified . . . or evidence is admissible." Fed. R. Evid. 104(a). Although concerns over credibility and the weight of the evidence will ordinarily go to the fact finder, the judge must consider whether the opinion evidence is capable of meeting the preponderance standard. Fed. R. Evid. 702 Advisory Committee Note to 2023 Amendments (cross-referencing Rule 104). In the main, this means that experts must not be permitted to voice opinions "that are unsupported by the expert's basis and methodology." *Id.* A judge's focus must be placed on the soundness of the principles and methods that underpin the opinion, rather than the persuasiveness of the opinion itself. *Rodriguez v. Hosp. San Cristobal, Inc.*, 91 F.4th 59, 70 (1st Cir. 2024). Only if the opinion is uninformed by principles and methods, is connected to the relevant facts exclusively by the say-so of the expert, or is speculative or incapable of validation should a judge exclude the evidence. *Id.*

The standard means by which the proponent of expert testimony will demonstrate its admissibility is by demonstrating that all four elements of Rule 702 are met, though establishing the following three factors is often deemed sufficient: (1) that the proposed expert is qualified by "knowledge, skill, experience, training, or education"; (2) that the proposed testimony concerns "scientific, technical, or other specialized knowledge"; and (3) that the testimony will be helpful to the fact finder. *Bogosian v. Mercedes-Benz of N. Am., Inc.*, 104 F.3d 472, 476 (1st Cir. 1997).

4

## DISCUSSION

**A.    DEFENDANTS' MOTION IN LIMINE TO EXCLUDE THE OPINIONS OF DR. GODLESKI**

John J. Godleski, M.D., Professor of Pathology Emeritus, Harvard Medical School, has opinions to offer in support of Plaintiff's cause.  His opinions are informed by his education and experience and by scanning electron microscopy (SEM) and energy-dispersive X-ray analyses (EDX) that he employed to study histologic slides and paraffin tissue blocks taken from Ms. Cartwright's diseased lung tissue.  He is prepared to describe pathology findings in Ms. Cartwright's treatment history, including the diagnosis of malignant mesothelioma, biphasic subtype (also described as malignant spindle cell neoplasm most consistent with malignant mesothelioma, sarcomatoid type).  *See* Dr. Godleski Letter Report dated Apr. 21, 2025, pp. 2, 4 (ECF No. 86-2).  Dr. Godleski's study of the slides did not disclose the presence of asbestos bodies but did disclose the presence of talc particles.  *Id.* pp. 3, 4, 6, 9.  Given the minuteness of the specimen available for examination, and extrapolating that the presence of talc "would . . . likely . . . be found in any section of this lung tissue," Dr. Godleski's opines that the evidence "is indicative of substantial talc exposure."  *Id.* p. 7.  He also propounds: "Although no asbestos bodies or asbestos fibers were found within this miniscule amount of tissue, the finding of talc strongly indicates that asbestos was also likely to be present in [Ms. Cartwright's] lung tissue and pleural space."  *Id.*

Despite the non-detection of asbestos bodies or fibers in the available samples, Dr. Godleski maintains that the presence of talc particles is consistent not only with substantial talc exposure but also with asbestos inhalation.  He writes:

> These findings show evidence of a significant inhalational exposure to talc. Importantly, the size range of the talc particles was too small for what would typically be yielded by pleurodesis procedures, and the histologic distribution of these particles was consistent with expected migration/dissemination patterns from inhalation.  Inhalational talc exposure is significant not only with regard to possible effects from the talc, but also because talc deposits and manufactured talc products may contain asbestos fibers, an observation that has been well-established.

*Id.* at 7 (footnoted citations omitted).  He further states: "The finding of talc particles in each level of the Permanox™ slides examined re-emphasizes the evidence for considerable talc inhalation . . . and the likelihood of significant asbestos exposure despite [asbestos] being below the level of detection in this small sample." *Id.* at 9.  He summarizes these findings and extrapolations in his conclusion, characterizing the significance of the non-detection of asbestos as follows:

> The absence of detected asbestos in the tissue blocks does not rule out the possibility of its presence there, but it indicates that the distribution is less than one particle/fiber of such substance per single ~2-micrometer planes of those tissue blocks, or slides cut from those blocks.

> Therefore, based on the findings of this case, it can be stated to a reasonable degree of medical certainty, that the SEM/EDX findings in the tissues of Ms. Cartwright are evidence for a significant inhalational exposure to talc.  Given that the only known cause of mesothelioma is asbestos exposure, and given that asbestos may contaminate talc-based consumer products (as detailed earlier in this report), the findings suggest that significant contaminating asbestos from Ms. Cartwright's talc exposure existed and played a substantial causal role in tumorigenesis in her case despite the fibers being below the limit of detection within these very small volumes of available lung tissues with the method used.

*Id.* at 11. In effect, Dr. Godleski relies on his experience and training to draw an inference of significant asbestos exposure based on evidence of significant talc inhalation.

Defendant requests that Dr. Godleski be prohibited from testifying on the subject of causation. Defendant states that a causation expert would be expected to testify that asbestos was present in the lung tissue in excess of background levels. Given that Dr. Godleski was unable to detect asbestos in the limited available samples, Defendant argues that Dr. Godleski's projection about the probable presence of asbestos does not rely on any reliable "methodology or legitimate science." Mot. Mem. at 2 (ECF No. 86). Defendant quotes Dr. Godleski's deposition testimony, in which he acknowledged that given the non-detection of asbestos bodies or fibers in the available samples, he could not reliably extrapolate the load of asbestos fibers in Ms. Cartwright's lung tissue through application of a scientific methodology. *Id.* at 4 (citing Godleski Dep., Mot. Ex. 1, at 63).

In opposition to the motion to exclude, Plaintiff argues that the mesothelioma diagnosis, which is undisputed, sets the stage for a finding of significant asbestos inhalation given Ms. Cartwright's history. Additionally, Plaintiff explains that peer-reviewed literature, with which Dr. Godleski is conversant, establishes the presence of asbestos in Johnson Baby Powder (JBP), a product that Ms. Cartwright is known to have utilized throughout her adult life. Based on these building blocks, Plaintiff argues that positive samples are not essential to prove causation, and that it is reasonable for an expert such as Dr. Godleski to formulate an opinion that asbestos contamination from JBP is the most likely explanation for Ms. Cartwright's development of mesothelioma.

7

Based on my review and understanding of the record in this case, including Ms. Cartwright's personal history of long-term use of JBP, the strong association between mesothelioma and asbestos exposure, Dr. Godleski's asserted finding of significant evidence of talc inhalation, and the underlying controversy over the existence of asbestos contamination in JBP, I am not convinced that Dr. Godleski's opinion on causation is subject to exclusion.  My conclusion is based on the helpfulness of Dr. Godleski's specialized knowledge in pathology and his findings upon scientific examination, his incorporation and analysis of the available facts and data that inform this particular case, his use of reliable principles and methods to detect evidence of significant talc inhalation, and his correlation of what he considers to be the most salient information, specialized knowledge, and existing principles and methods in support of an opinion that the fact finder could regard as one reliable basis to support a finding that Ms. Cartwright's mesothelioma was caused by asbestos that traveled to her lungs most likely in connection with talc inhalation.  To be sure, Defendant's challenge may well erode Dr. Godleski's credibility and deprive his opinion of weight in the mind of the fact finder.  But assuming that the case presented by Plaintiff is otherwise demonstrative of asbestos contamination in JBP, the exclusion of Dr. Godleski's causation opinion would subject his opinion to a more demanding standard than proof by a preponderance of the evidence.  This motion is therefore denied.

**B.      PLAINTIFF'S MOTION TO EXCLUDE CUMULATIVE AND IRRELEVANT EXPERT OPINION TESTIMONY**

Plaintiff requests that the Court order in advance that Defendants not call more than one expert to testify on any topic or inquire as to certain irrelevant topics discussed in the experts' reports.  Pl. Mot. (ECF No. 75).  Rule 403 of the Federal Rules of Evidence authorizes a trial judge "to exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  In opposition to the request, Defendants state that each of their experts has approached the case from the perspective of a distinct discipline (epidemiology, pulmonology, toxicology, pathology, geology, and industrial hygiene) and that certain supposedly irrelevant topics actually bear on the scientific assessment of the causation problem.  Def.'s Opp'n (ECF No. 103).  This is in keeping with the colloquial rule of thumb familiar to all civil litigators that generally one expert per issue is all that is permitted.  Defendants, as I understand it, advance the idea that the "issues" are divided among distinct disciplines not simply divvied up neatly to a single causation expert witness.

With all this in mind, Plaintiff's point is appreciated.  Nonetheless, I conclude that the best venue in which to rule on such an objection is at the trial.  If the testimony of Defendants' several experts is unwittingly or by design pressed into action as a credentialled platoon, overlapping their "issues" so as to overwhelm the jury with their cumulative expertise, rather than to discreetly stay in their lanes without further enlightening the jury, I'll be inclined to shut it down as running afoul of Rule 403, and will

9

entertain curative instructions to the effect that the battle of the experts is to be decided based on the quality rather than the quantity of witnesses.

As for the supposedly irrelevant topics, Plaintiff has only listed them without plumbing their depths.  Still, there does appear at first blush to be little correlation between the facts of this case and, for example, studies associated with peritoneal (rather than pleural) mesothelioma or, say, erionite exposure.[2]  However, relevance is an expansive concept.  Defendants offer that mesothelioma has more causes than just asbestos exposure and that it is generally associated with more intensive exposure in occupational environments involving commercial amphiboles.  Additionally, Defendants' experts contend that studies of peritoneal mesothelioma have helpful lessons on the subject of mesothelioma causation from exposure to asbestos.  I am satisfied for present purposes that these opinions and counter-opinions could be helpful to the jury and likely will not be a waste of time (particularly if they are not reasserted in a cumulative manner).  This motion is therefore denied.

### C.    PLAINTIFF'S MOTION TO EXCLUDE EXPERT CAUSATION OPINIONS RELATED TO CYNTHIA CARTWRIGHT'S WORKSITES

Following Cynthia Cartwright's death from mesothelioma, Plaintiff agreed with an attorney that it would be sensible to file claims with multiple (30+) bankruptcy trusts formed to pay mesothelioma claims based on workplace exposure.  All but a few of the

---

[2] Plaintiff also argues that testimony concerning possible genetic causation should be excluded because Ms. Cartwright was tested across 80 genes.  But cross-examination and competing evidence will be available to contextualize this point, which goes to weight rather than admissibility.

claims Plaintiff presented were rejected.  Plaintiff received compensation, however, from four of the trusts.  Plaintiff submitted sworn affidavits in support of the claims, asserting that his familiarity with his wife's employment history supported a finding of employment-related asbestos exposure.  Not content to rely exclusively on the record related to the trust claims, Defendants subpoenaed asbestos and asbestos remediation evidence from each of Ms. Cartwright's former employers.  The subpoena responses, according to Plaintiff, do not provide sufficient data to support a specific causation finding for workplace asbestos exposure.  Additionally, based on his more recent equivocation concerning the assertions he previously made in trust claims paperwork, Plaintiff argues that Defendants' experts should be forced into silence on the subject.  Pl. Mot. (ECF No. 78).

More specifically, through this motion to exclude, Plaintiff asks the Court to prevent Defendants' causation experts from offering opinion testimony that Ms. Cartwright's mesothelioma "was or may have been caused by asbestos exposure at her workplaces." *Id.* at 1.  For purpose of Rule 702, Plaintiff asserts that such an opinion would not be based on any known facts or data related to Ms. Cartwright's exposure in the workplace, only on Plaintiff's prior assertions[3] that his wife's mesothelioma was so caused, before he concluded that inhalation of JBP was the cause.

As stated previously, an expert's opinion testimony must rest on facts and data.  Plaintiff's sworn assertions related to possible asbestos sources in his wife's workplaces

---

[3] For instance, Plaintiff described Ms. Cartwright's job duties as including "heat treating equipment operator" work involving "an asbestos product," Response (ECF No. 104) at 2 & Ex. 3 (ECF No. 104-4, PageID # 6425), and working with heat sources "outfitted with power cords wrapped in asbestos," *id.* Ex. 6 (ECF No. 104-7, PageID # 6506-6507).

and the payment of claims by four trusts provide some facts and data on which Defendants' experts can comment.   But an expert's opinion must also be the product of reliable principles and methods; it cannot simply involve a statement that is no more revealing than any layperson's understanding of the available evidence would be.

Defendants observe that it is not their burden to prove causation in this case, but rather Plaintiff's burden.  Defs. Opp'n at 13.  They argue that their experts, in the role of rebuttal experts, should have the leeway to opine that workplace exposure needs to be excluded as a likely cause before the fact finder can find that talcum powder inhalation was the specific cause of Ms. Cartwright's mesothelioma.  *Id.* at 11.  They also state that the motion raises a "classic credibility determination for the jury and one that is properly pursued by cross-examination at trial."  *Id.* at 3.  Their response also reveals that one of the challenged experts has taken more of a lead on the issue.  *Id.* at 11-12 (discussing separately the anticipated testimony of Dr. Paul Nony).

In reply, Plaintiff proposes that the unhelpful evidence produced by Ms. Cartwright's former employers in response to Defendants' subpoenas should be deemed the only probative evidence on the subject of workplace exposure (because it is the only primary source evidence) and that no expert should broach the topic at trial because the evidence does not disclose any asbestos remediation activity during Ms. Cartwright's tenure at the varied institutions.  Plaintiff also emphasizes that his motion is focused on preventing specific rather than general causation opinions.  Reply at 3 n.1 (ECF No. 114).

Based on my review of the record of workplace exposure, I am persuaded by Plaintiff that Defendants' experts should not be allowed to voice the specific causation

12

opinion that Ms. Cartwright's mesothelioma was more likely than not caused by workplace exposure to asbestos because there does not appear to be a reliable evidentiary basis or methodology for reaching that opinion in this case based on a preponderance standard. On the other hand, I also agree with Defendants that it is proper for their experts to opine that Plaintiff's experts should not exclude the possibility that workplace exposure caused Ms. Cartwright's mesothelioma as part of any examination into whether talc inhalation was the specific cause of her mesothelioma. I will allow that opinion to be stated at trial. Defendants' experts will also be allowed to opine whether workplace exposure of the kind previously asserted by Plaintiff has any potential to explain disease etiology without themselves voicing the opinion that workplace exposure was the specific cause of Ms. Cartwright's mesothelioma. In other words, they do not need to be able to point to data capable of proving specific causation from workplace exposure in order to opine that it has not been ruled out on this record. They will not be precluded from voicing such opinions because such opinions are potentially helpful opinions concerning scientific principles and methods in the context of this case's particular record. *Lawes v. C.S.A. Architects & Eng'rs LLP*, 963 F.3d 72, 101, 107 (1st Cir. 2020). Plaintiff is free to cross-examine the experts on the subject in an effort to emphasize that the evidence retrieved from the subpoenas is an unreliable basis to think that workplace exposure is even a theoretical cause, as well as to attempt to undercut the experts' persuasiveness based on their alleged lack of familiarity with the same.

Separately, Defendants' experts must refrain from voicing opinions concerning the Plaintiff's credibility or truthfulness if a question somehow puts them in the position of

13

comparing Plaintiff's causation assertions in the asbestos trust claims with his causation assertion in this case. Plaintiff's credibility is exclusively the province of the fact finder and the fact finder does not need assistance from experts on that issue. *United States v. Shay*, 57 F.3d 126, 131 (1st Cir. 1995).

Based on these assessments, I will characterize my ruling on this motion as a partial grant. However, to be clear, I am not prepared at this time to preclude any and all mention by Defendants' experts of the factual assertions Plaintiff made in support of the asbestos trust claims or of the existence of asbestos (even if only undisturbed asbestos) in certain of Ms. Cartwright's former workplaces. Thus, they are not precluded from testifying that they looked at some or all of the facts or data in question as part of their record review. As for the thoroughness of their record review, that is grist for the cross-examination mill and I regard it at this juncture as presenting a matter of weight rather than admissibility.

**D.  PLAINTIFF'S MOTION TO EXCLUDE EXPERT TESTIMONY OF DR. MATTHEW SANCHEZ**

Dr. Matthew Sanchez is one of Defendants' expert witnesses. Dr. Sanchez acknowledges that asbestos can be present in both talc deposits and in finished talc products. *See*, *e.g.,* Mot. Ex. 2 (ECF No. 81-2). But Plaintiff insists that Dr. Sanchez's testimony must be excluded because the methodology he uses to detect asbestos in powdered talc products is antiquated and he has refused to keep up with recent developments in asbestos detection standards. Additionally, in a different case, Dr. Sanchez was set up at a deposition to opine whether specific laboratory images (photomicrographs) of isolated asbestos in fact depicted asbestos, and he demurred. The

14

asbestos plaintiffs' bar in this case and others has argued that the combination of these two things requires courts to remove Dr. Sanchez from cases involving alleged talcum powder asbestos exposure.  Pl. Mot. (ECF No. 81).

Defendants describe Dr. Sanchez as their mineralogy, geology, and microscopy expert.  They respond that his views are concededly based on a methodology and that "disagreements in the literature [do] not render a recognized methodology unreliable." Defs. Opp'n at 1-2 (ECF No. 102).

Based on my review of the arguments and the cited literature, which includes a variety of regulatory material, including a proposed agency rule[4] that was recently withdrawn based in part on the complexity of asbestos testing, I am persuaded by Defendants that Dr. Sanchez's approach to asbestos detection employs a reliable standard for the microscopic detection of asbestos even if that standard is exceedingly demanding in relation to the identification of asbestos or of limited precision in the talcum powder context.  The alleged demanding nature or limited precision of Dr. Sanchez's methodology can be addressed in cross-examination.  Plaintiff can also inquire of Dr. Sanchez concerning the fact that the Food and Drug Administration once propounded the increased utility of a supplemental asbestos detection methodology for powdered cosmetic talc.  The

---

[4] *Testing Methods for Detecting and Identifying Asbestos in Talc-Containing Cosmetic Products*, 21 C.F.R. Part 730 (FDA Dec. 27, 2024) (drawing in part on conclusions drawn by the Interagency Working Group on Asbestos in Consumer Products) (Mot. Ex. 2); Proposed Rule Withdrawal, 90 Fed. Reg. 54603 (FDA Nov. 28, 2025) (Mot. Ex. 4).  *See also* Modernization of Cosmetics Regulation Act of 2022, Pub. L. 117-328 § 3505 (Dec. 29, 2022) (directing the Secretary of Health and Human Services to "promulgate proposed regulations to establish and require standardized testing methods for detecting and identifying asbestos in talc-containing cosmetic products" and thereafter to "issue such final regulations.").

presentation of all of this scientific information will prove helpful to the jury. Accordingly, this motion will be denied.

### E.    DEFENDANTS' MOTION TO EXCLUDE EXPERT OPINIONS OF SEAN FITZGERALD

Sean Fitzgerald is a geologist and mineralogist. His opinions are classified as a contamination opinion, in which he opines that the JBP Ms. Cartwright used included asbestos, and an exposure opinion, in which he opines that Ms. Cartwright was exposed to asbestos through her use of JBP because the asbestos becomes airborne, and that her exposure would be significant based on her alleged decades of use. Pl. Opp'n Ex. 6 (ECF No. 106-6) (hereafter "Fitzgerald Letter Op."). Defendants move for the exclusion of these opinions on the ground that they are unreliable. As cause, Defendants assert that Mr. Fitzgerald sampled JBP sourced from talc deposits different than those used to produce JBP during Ms. Cartwright's period of use. Additionally, Mr. Fitzgerald reports positive identification of asbestos in eight bottles of JBP but has also conceded that he failed to detect asbestos in other samples. As for his alleged positive findings, Defendants assert that Mr. Fitzgerald cannot produce some of the underlying data because it has been lost. As for his negative findings, Mr. Fitzgerald has preserved none of the underlying data at all. Defendants complain that they are prejudiced in their ability to cross-examine Mr. Fitzgerald because they cannot reliably evaluate the data that informs Mr. Fitzgerald's opinions. They also argue that Mr. Fitzgerald should not be heard by the jury because his methods of examination were unreliable and are not generally accepted. Defendants also argue that Mr. Fitzgerald should not be permitted to testify in a way that imports the

16

contamination opinions of a specific, non-testifying expert, Dr. William Longo. Defs. Mot. Mem. (ECF No. 83-1).

The talc used to manufacture JBP in the years of Ms. Cartwright's use of the product came from source mines in Italy (1926-1973, 1979), Vermont (1964-2003), and China (2003-present). Talc is a soft, layered, hydrated magnesium silicate mineral, one of the softest known minerals, that is mined from rock and then pulverized or milled into powder. Fitzgerald Letter Op. at 9. Talc forms through geological processes that also formulate other silicate minerals, six of which can crystalize in either "asbestiform" or "nonasbestiform" habits. *Id.* at 15-16. Five of the six minerals are "amphibole minerals." *Id.* at 10. The sixth is chrysotile serpentine. *Id.* These various minerals, including talc, "are closely related" and "form under similar conditions in regional or contact metamorphism of ultramafic rocks, especially in the presence of carbonates and water, as all of these minerals are hydroxylated magnesium silicates." *Id.* at 12. The disposition of these related minerals in a mine can be thought of as a chemical "solid solution," with transitions from one mineral to the next occurring as connected phases in which one phase of the magnesium silicate mineralogic continuum "grade[s] into another along a solid solution series." *Id.* at 15-16. Based on the geology of mineral deposits that form magnesium silicate talc and its amphibole silicate relatives, the presence of amphibole minerals alongside talc is a geologic or mineralogic or chemical fact. According to Mr. Fitzgerald, because "talc is primarily formed from the metamorphism of magnesian minerals, including serpentine and amphibole, . . . [it is to be anticipated that] metamorphically formed talc [will] contain or be found with asbestos." *Id.* at 14.

17

The amphibole minerals are only classified as asbestiform when they form as long, thin, flexible fibers.  When milled, the asbestiform habit of these minerals will separate into fibers with high tensile strength and flexibility.  These minerals in asbestiform habit are recognized carcinogens.  The nonasbestiform habit, when milled, breaks into cleavage fragments.  The nonasbestiform habit is much more prevalent than the asbestiform habit.  In the nonasbestiform habit, these amphibole minerals are not recognized as carcinogens.  Consequently, the presence of an amphibole mineral in a talc deposit, or the presence of amphibole mineral particles in a milled (powdered) talc cosmetic product, is not alone proof of "asbestos" contamination even though these amphibole minerals may be present in abundance.  To positively identify such a mineral as asbestos, the mineral must have mineralized or crystallized in its asbestiform habit.

According to Mr. Fitzgerald, for decades asbestiform amphiboles and serpentine have been detected in ore samples taken from mines associated with the production of JBP.  Asbestiform amphiboles and serpentine have also been detected in powdered talc products, including JBP.  Yet, to date, regulation of talc production to exclude asbestos is lacking.  The FDA does not require any testing of talc for the presence of asbestos.  Fitzgerald Letter Op. at 23.  Ostensibly, he says, it might be possible to select mining sites carefully for talc lacking amphiboles or serpentine in their asbestiform habit, but even circa 2019 asbestos has been detected in JBP, leading Johnson & Johnson to recall the product.  *Id.* at 2 (citing Dr. Longo's work as an example of such testing).

Asbestiform fibers and nonasbestiform cleavage fragments are difficult to distinguish under microscopic examination.  One data point that is commonly considered,

18

once the correct mineral is identified, is the "aspect ratio" of the mineral particle or bundle viewed under the microscope.  This ratio is expressed in terms of the relationship between the particle's length and width.  Asbestiform amphibole particles occur in mineral deposits as thin crystalline fibers with high aspect ratios.[5]  One long-employed standard anticipates an aspect ratio of 20:1 or higher.  As the aspect ratio decreases, it is increasingly likely that the suspect mineral particle could as likely be a nonasbestiform cleavage fragment as an asbestiform fiber, if aspect ratio is the only criterion employed by the examiner.  Nonasbestiform cleavage fragments can occur with aspect ratios of, for example, 3:1 or 5:1.

Some scientists in the field have concluded that the milling process will make asbestiform fibers appear as nonasbestiform cleavage fragments, by reducing the aspect ratios of the asbestiform fibers below what one would expect when examining minerals deposited in source ore or manufactured into "bulk asbestos" products.  These scientists, who include Mr. Fitzgerald, opine that exclusive reliance on polarized light microscopy (PLM) to search for a 20:1 aspect ratio is an insufficient methodology to detect or rule out the presence of asbestos particles in powdered talc.  Instead, they maintain that transmission electron microscopy (TEM) can be used to reliably detect the presence of asbestos fibers even when they are reduced in length to 5 micrometers and have an aspect ratio of less than 20:1.  Whereas scientists who depend exclusively on standards developed for PLM detection (the EPA's 600/R-93 standard) might argue that asbestos is rarely found

---

[5] There is also a serpentine version of asbestos, with a curled morphology.

19

in powdered talc, scientists who favor TEM as a diagnostic tool would argue that PLM is simply inadequate to the task of asbestos detection after the minerals in question have been pulverized by the milling process. Using the TEM method, an amphibole fiber is counted as asbestiform if its length is greater than or equal to 0.5 μm, its aspect ratio is 5:1 or greater, it has substantially parallel sides, and its ends exhibit a split or dovetailed morphology. *See* 40 C.F.R. Part 763, Subpt. E, App. A, § (II)(F) (outlining Mandatory Transmission Electron Microscopy Method); Fitzgerald Letter Op. at 18-19.

Mr. Fitzgerald has outlined much of the foregoing information in his letter opinion. He has also characterized the Italian-, Vermont-, and China-based talc deposits from which Defendants produced JBP over the years. The geology of these deposits, according to Mr. Fitzgerald, are all consistent with geological processes that yield asbestiform serpentine and amphibole minerals alongside talc. Fitzgerald Letter Op. at 28-37. Furthermore, upon examination, asbestos has been identified in talc ore or milled talc taken from all of the source mines in these three locales. *Id.* at 28-37, 49-50.

Mr. Fitzgerald has also conducted his own testing of various samples of JBP, some of early (mid-Twentieth Century) vintage and some of more recent vintage. Although he was not able to test any of the bottles actually purchased and used by Ms. Cartwright over the years, his positive findings of asbestos in several tested samples (in varying concentrations) leads him to conclude that some of the bottles that were used by Ms. Cartwright would have been contaminated similarly with asbestos.

As for the mode of Ms. Cartwright's ingestion of asbestos fibers, Mr. Fitzgerald opines based on "releasability tests" that asbestos becomes airborne in concentrations

20

significant to human health during use and application of JBP. *Id.* at 54-55. These tests involved the release of JBP into a closed environment and examination of particles taken up in HEPA filters using air pumps. It is sometimes referred to as a "glovebox" simulation because the test involves an enclosed space and the use of "glovebox style shoulder-length gloves . . . sealed to a Plexiglas® shield." *Id.* at 44.

### 1. Contamination Concern

#### a. *Relevance of sample sets*

Defendants challenge the relevance of the JBP samples from which Mr. Fitzgerald reports making positive asbestos findings. Mot. Mem. at 13-14. Based on Defendants' account of the source mine concern, *i.e.*, that the degree of asbestos contamination of one mine or one ore deposit will not be identical to that of another, Plaintiff's challenge is to reassure the Court that Mr. Fitzgerald's findings have relevance to Ms. Cartwright's JBP use and, moreover, provide reliable grounds on which to base a finding concerning the likely existence of asbestos contamination in the JBP bottles used by Ms. Cartwright during her lifetime.

Based on my review of Plaintiff's opposition, Mr. Fitzgerald found asbestos in JBP samples taken from an expansive period of time, spanning dates before, during, and after the period of Ms. Cartwright's use (whether that use is measured as starting in either the 1960s or the 1970s). His tests offer a reliable basis for concluding that regardless of time period or source mine, and consistent with Mr. Fitzgerald's geology and mineralogy lessons concerning the phased formulation of solid solution magnesium silicates, it is to be anticipated that JBP, being produced from talc ore, will be contaminated to varying degrees

with amphibole and serpentine mineral deposits in their asbestiform habits.  While it is possible and has been demonstrated that a given sample may not be contaminated with asbestos, the opinion evidence and the principles and methodologies it is based on permit a finding that it is probable (rather than merely possible) that some subset of samples will contain asbestos, that contamination with asbestos will occur with a degree of regularity, and that the contamination will involve a variety of asbestos minerals in varying concentrations.  Thus, even for test results drawn from samples having an origin outside of the "relevant" time period, reliable lessons are available, and the jury will no doubt understand and appreciate that contaminated samples taken from JBP sourced from different mines and different time periods are not direct proof that the JBP used by Ms. Cartwright was contaminated with the same asbestiform mineral in the same degree.  The jury can take that into account as a matter of weight when engaged in deliberations concerning the probability of significant contamination occurring over multiple decades of use.

### b.  Underlying data

Defendants challenge the fairness of allowing Mr. Fitzgerald to express an opinion about tests he performed, asserting that he failed to preserve the data on which he relied, such as supporting images, and totally failed to preserve any information concerning negative results.  Mot. Mem. at 15-16.  I conclude that this challenge also goes to weight rather than admissibility.  Based on Plaintiff's opposition, Mr. Fitzgerald disclosed data associated with his positive findings.   Pl. Opp'n at 19 (ECF No. 106).   Additionally, concerning his negative findings, the jury will learn that Mr. Fitzgerald has conducted tests

of JBP samples that were negative for the presence of asbestos.  Although it appears that Mr. Fitzgerald has failed to preserve data associated with his negative findings—though he has recovered some in connection with this motion process—Mr. Fitzgerald's positive findings are not rendered unreliable by his failure to prove his negative findings. Incidentally, the acknowledgment of negative test results reveals that the TEM methodology does not guarantee false positives.

### c.  Chain of custody/authenticity

Defendants challenge the fairness of allowing Mr. Fitzgerald to express an opinion about tests he performed with JBP bottles having unknown origins and chains of custody. Mot. Mem. at 16-19.    Based on Plaintiff and Mr. Fitzgerald's rejoinder, including Mr. Fitzgerald's affidavit (ECF No. 106-20), I conclude that the record can support a finding that the samples are what they are purported to be.  The samples were drawn from product encapsulated in tamper-proof packaging.  There is no apparent reason to suspect malfeasance or that the mineral composition of the packages' contents would change over time.  Under the circumstances, given the packaging and contents involved, there is no cause to preclude the evidence as inherently unreliable or to superimpose demanding chain-of-custody requirements.  The jury could but would not be required to conclude that an expert in the field would reasonably rely on these samples as data in support of an opinion. *See* Fed. R. Evid. 703.  Thus, the challenge goes to weight rather than admissibility.

### d.  Methodology

Defendants challenge the fairness of allowing Mr. Fitzgerald to express an opinion about asbestos identification, arguing that his use of transmission electron microscopy

23

(TEM) departs from accepted standards in a manner that they say is known to produce false positive findings. Mot. Mem. at 20-24. I find that this argument (including its protestations related to the Yamate protocols) presents only a matter of the weight to be assigned to Mr. Fitzgerald's methodology. In effect, this part of Defendants' motion is the mirror image of Plaintiff's motion to exclude Dr. Sanchez's opinion based on an allegedly unreliable methodology. The opposing geology and mineralogy experts are, in effect, at odds about the best approach for identifying asbestos in powdered talc and the reliability of the new approach involving TEM and related standards. But they are employing scientific methodologies on both sides. Mr. Fitzgerald's utilization of TEM and the associated regulatory standards is reliable, fits the case, and should prove helpful to the jury, even if the jury ultimately is not persuaded by Mr. Fitzgerald's methodology and the associated findings.

### 2.    Exposure Concern

Defendants raise two challenges to Mr. Fitzgerald's opinion that Ms. Cartwright "was exposed to significant airborne asbestos." Mot. Mem. at 24. The first is based on the relevance of the samples and the chain-of-custody concern. I have already concluded that these arguments do not warrant exclusion. The second argument is that the "glovebox" test is unreliable. *Id.* at 25-26. As Defendants see it, powdering a baby doll in a confined space (which is what is depicted in Mr. Fitzgerald's Letter Opinion, at p. 44) is not representative of Ms. Cartwright's alleged exposure, which consisted of powdering her shoes in a more open space. They observe that, by artificially confining the volume of air, the resulting asbestos concentration readings do not fit the circumstances of this case. *Id.*

24

at 25 (citing Mot. Ex. 26 at 8, ECF No. 83-28 (EPA Memo noting that "air sampling within an experimental enclosure may not be representative of real-life exposures") & Mot. Ex. 30 at 5, ECF No. 83-32 (Dr. Sanchez rebuttal report asserting that the artificial restriction of the volume of air is not a scientifically valid demonstration for purposes of Ms. Cartwright's alleged exposure)).

Plaintiff argues that the tests are a proper means of demonstrating exposure via inhalation and that Mr. Fitzgerald does not intend to offer any opinion about exposure concentration; only that asbestos is released into the air and becomes breathable. Opp'n at 26. Based on my review of the paper, "Asbestos in Commercial Cosmetic Talcum Powder as a Cause of Mesothelioma in Women," published in the *International Journal of Occupational and Environmental Health* (ECF No. 82-18 & 106-7), with its depiction of air intakes at face height, the test appears in my judgment to be both reliable and fit to demonstrate inhalation risk based on common application of powder below the level of the user's breathing zone (rather than above the face in the case of a test involving an air intake placed to represent the breathing zone of a supine infant). Although the image contained in Mr. Fitzgerald's Letter Opinion (ECF No. 106-6 at 44) does not depict the intake for the "'parent' breathing zone," the test as described did involve such an assessment and therefore is reliable and fits the facts of this case well enough for Rule 702 purposes. Compare ECF No. 106-7 at 320 (depicting intakes at the level of a standing user's breathing zone with use of the product at a lower level). The jury could regard the demonstration as helpful to its deliberation as to whether powdered asbestos fibers, like powdered talc,

become airborne above the level of application during ordinary use. The relative advantages and shortcomings of the methodology go to weight rather than admissibility.

### 3.   Dr. Longo

Defendants seek to exclude expert testimony from Dr. Fitzgerald concerning studies performed by non-testifying expert Dr. William Longo. They observe that the samples Dr. Longo tested are similarly of the wrong provenance and are not reliable based on source mine and chain-of-custody considerations. They also argue that the admission of Dr. Longo's opinions through Mr. Fitzgerald would be improper because it is hearsay and allows Mr. Fitzgerald to simply parrot another expert's opinions. Mot. Mem at 26-28.

As indicated previously, Mr. Fitzgerald has conducted independent testing of JBP samples. In addition, he states that he has "extensively review[ed] the testing reported by Dr. William E. Longo, PhD in the report titled: *Analysis of Johnson & Johnson Baby Powder and Valiant Shower to Shower Talc Products For amphibole (Tremolite) Asbestos*, dated August 2, 2017." Fitzgerald Letter Op. at 39. According to Mr. Fitzgerald, he has independently "review[ed] the testing methodology . . . , the underlying analytical bench sheets, and the photographic documentation of the samples." *Id.* On that basis he agrees with Dr. Longo's statements concerning his positive findings. Plaintiff argues that because Mr. Fitzgerald has reviewed and evaluated Dr. Longo's methodology and has expertise in the subject matter, he is not merely parroting another expert's opinion and offers, instead, his own opinion about the reliability of the underlying findings. Pl. Opp'n at 28-29.

In reply, Defendants observe that, in 2002, Dr. Longo described asbestos in talc as an "urban legend" and explained that he had performed his own studies but never found it.

26

ECF No. 117 at 6-7.  However, Dr. Longo's more recent findings are based on work performed in 2017, evidently involving a new methodology.  *Id.*  Also of concern to Defendants is the fact that Dr. Longo formed his opinions when he was otherwise engaged as a plaintiff's expert in asbestos litigation.  Defendants maintain that Plaintiff should have called Dr. Longo as an expert if they intended to rely on any conclusions he drew from his testing and should not be able to bring Dr. Longo's conclusions or testing into this case through Mr. Fitzgerald.

"An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.  If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."  Fed. R. Evid. 703.  I conclude that Dr. Longo's testing of JBP for asbestos contamination falls within the "facts or data in the case" because part of what this trial concerns is the likelihood of asbestos contamination in Johnson & Johnson talc products manufactured across several decades.  Here, Mr. Fitzgerald has reviewed and analyzed the data that informed Dr. Longo's findings and should be permitted to relate them given his own expert qualifications in geology, mineralogy, and electron microscopy, all of which enable him to evaluate the merit of Dr. Longo's reported findings and respond to cross-examination concerning the reliability and significance of the methodology Dr. Longo employed.  In generational, mass torts litigation it is to be expected that there will be periodic changes in expert witnesses, and this should be allowed to occur without reinventing the wheel or abandoning the facts and data gathered along the way, provided that testifying experts are appropriately versed in the relevant methodology and

27

the earlier data allows for independent evaluation on methodological grounds (as opposed to mere parroting of someone else's findings).  I recognize that Defendants would prefer for any mention of Dr. Longo to include his circa 2002 "urban legend" remark, but that comment does not have so much inherent impeachment weight that it should require that Dr. Longo appear as a witness in order for his significantly later electron microscope findings to be a topic of expert discussion in powdered talc mesothelioma cases.

**F.    DEFENDANTS' MOTION TO EXCLUDE CERTAIN OPINIONS OF DR. DAVID MADIGAN**

Defendants seek the exclusion of Dr. David Madigan's anticipated testimony and, if necessary, a hearing to explore the bases thereof.  Defs. Mot. (ECF No. 82).  Dr. Madigan is a statistician and epidemiologist.  He also has experience as a drug safety consultant.  Plaintiff intends to offer at trial certain opinions from Dr. Madigan that are designed to express the statistical likelihood of asbestos exposure and mesothelioma illness based on the extent of a person's use of Defendant's talcum powder products.  Defendants challenge Dr. Madigan's probability of exposure opinions, any opinion about the causation of mesothelioma trends, and an opinion on the subject of general causation based on an individual's alleged decades long asbestos exposure.

### 1.    *Probability of asbestos exposure*

Dr. Madigan offers to calculate the probability that a consumer of JBP was *not* exposed to asbestos based on the number of bottles of JBP used by the consumer.  Additionally, he purports to calculate with a 95-percent prediction interval the number of asbestos-containing JBP bottles that exist in a population of $n$ total bottles.  To do this, he

28

has in part relied on inputs concerning asbestos contamination in bottles of JBP reported by Dr. Longo and Mr. Fitzgerald.

Dr. Madigan's reliance on other experts is not inherently problematic—experts routinely build their testimony on top of inputs drawn from other experts—but it becomes a problem if the non-testifying expert's inputs do not plug into the testifying expert's methodology without raising reliability concerns in the context of the testifying expert's own methodology. One version of this concern arises when the testifying expert serves as a Trojan horse who smuggles in another expert's opinions even though the testifying expert has no relevant expertise to speak on the reliability of the smuggled opinions. This concern has varyingly been referred to as involving an expert who would amount to a "parrot," "ventriloquist dummy," "mouthpiece," or mere "conduit." *See Schoen v. State Farm Fire & Cas. Co.*, 638 F. Supp. 3d 1339, 1349 (S.D. Ala. 2022); *United States v. Zolot*, 968 F. Supp. 2d 411, 426 (D. Mass. 2013); *Williams v. Illinois Dep't of Corr.*, No. 3:19-cv-739, 2023 WL 1472246, at *13 (S.D. Ill. Feb. 2, 2023); *Estate of Cape v. United States*, No. 11-cv-357, 2013 WL 4522933, at *2-3 (E.D. Wis. Aug. 27, 2013); *see also Dura Auto. Sys. of Ind., Inc. v. CTS Corp.,* 285 F.3d 609, 614 (7th Cir.2002) ("A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty. That would not be responsible science.").

Here, Dr. Madigan has generated a group of calculations based on inputs taken from MAS (Materials Analytical Services LLC), an entity at which Dr. William Longo is CEO. Mot. Ex. Z ¶ 6 (ECF No. 82-28). As previously noted in the context of the challenge to Mr. Fitzgerald's testimony, above, Dr. Longo is not designated to testify as an expert

29

witness in this case though he has a history of testifying as an expert for plaintiffs in asbestos cases. But Dr. Madigan has also generated calculations based on inputs from Dr. Fitzgerald, who is designated to testify. Defendants challenge both the Longo inputs and the Fitzgerald inputs.

Dr. Madigan would utilize Dr. Longo's reported findings in support of his first batch of prediction interval calculations. Evidently, this batch of calculations draws on Dr. Longo's report of finding contamination in 18 of 31 bottles, though some of these were not JBP bottles. Defendants object that the presentation of Dr. Madigan's calculations in the absence of any underlying testimony from Dr. Longo allows Plaintiff to present to the jury Dr. Longo's opinion about the presence of asbestos in JBP without Defendants having the opportunity to cross-examine Dr. Longo concerning his alleged findings.

In opposition to the request to exclude that portion of Dr. Madigan's opinions that draw on Dr. Longo's (or MAS's) findings, Plaintiff asserts that Dr. Longo's findings are now established in the peer-reviewed literature and that perhaps Defendants can use their own geology expert, Dr. Sanchez, to rebut the opinions of Dr. Longo, even though Dr. Longo will not appear at trial. Pl. Opp'n at 10 (ECF No. 101). I am not persuaded that the proper methodology for introducing a non-testifying geologist's opinions is by tucking them inside a statistician's calculations. However, in this case there is a testifying geologist, Mr. Fitzgerald, and his testimony has the potential to provide a proper platform for the introduction and consideration of Dr. Longo's findings, which in turn serves as a springboard for Dr. Madigan to employ the findings in his calculations.

As for Mr. Fitzgerald's inputs, Dr. Madigan states that Mr. Fitzgerald found contamination in seven of eight bottles of JBP, which he translates to an incident rate of 87%. Defendants note that such a rate has no real basis, given the size of the set (eight bottles) and Mr. Fitzgerald acknowledgement that he has had several more negative (and positive) findings in his work other than these eight bottles that could inform his personal sample set. However, it appears that some of the studies Mr. Fitzgerald conducted are subject to confidentiality and/or non-disclosure agreements. Plaintiff states simply that "Dr. Madigan will offer statistical insights based on his understanding, through his review of other expert testimony and the relevant literature, that JBP does contain asbestos." Pl. Opp'n at 6-7.

Principally, there is no inherent flaw in Dr. Madigan's methodology. However, the trick lies in selecting numerators and denominators for purposes of an incident rate. It strikes me as unreasonable, frankly, to begin with an incident rate of 87% based on a set of only eight samples from Mr. Fitzgerald, especially when he acknowledges that he had, but did not maintain records of, negative findings that this sample set does not account for. But I agree with Plaintiff that, ultimately, "Dr. Madigan's statistical analysis can be applied to any data set, which means that either side can ask him hypothetical questions based on a predicate assumption about the number of bottles in a population found to contain asbestos." Opp'n at 14. In other words, in the context of a probabilistic assessment based on whatever incident rate the jury concludes is most consistent with the evidence, the provision of expert guidance concerning the corresponding prediction intervals for $n$ bottles can prove helpful to the jury's deliberations. Moreover, the jury is likely to appreciate on

31

its own, especially in the context of cross-examination, that the background evidence does not dictate application of an 87% incident rate. Mr. Fitzgerald himself will probably state as much, if his deposition testimony is taken at face value. Mot. Mem. at 8 (quoting Mot. Ex. AA at 23 (ECF No. 82-29)). But the jury will also be assisted if instructed how to consider the impact of differing incident rates on the likelihood that bottles of JBP used by Ms. Cartwright would have asbestos contamination, given the number of bottles she is believed to have used in her lifetime. Dr. Madigan's expertise and opinion testimony are in this way fitted to the case and should prove helpful to a lay jury unfamiliar with statistical analysis and prediction intervals or predictive inference.

    *2.    Trends*

Defendants challenge Dr. Madigan's opinion that there is a strong mathematical correlation between the prevalence of cosmetic talc on store shelves and, years later, the incident rate of mesothelioma in women. In particular, Defendants challenge a graph drawn by Dr. Madigan that they say distorts the underlying data to mislead rather than assist the jury. Mot. Mem. at 8-17. Plaintiff does not concede the point but offers that Dr. Madigan has updated the graph in question and will simply use the source graph provided by the government website from which the underlying data is sourced, specifically, the National Cancer Institute's Surveillance, Epidemiology, and End Results ("SEER") Program. Otherwise, Plaintiff intends to have Dr. Madigan speak to the fact that the SEER data shows that the mesothelioma rate for women (while lower than that for men) has decreased in recent years at a slower pace than the decrease observed for men. Opp'n at 16-17 (ECF No. 101). In response to Defendants' argument that Dr. Madigan does not

32

actually purport to see causation in the data, Mot. Mem. at 17, Plaintiff states that Dr. Madigan "will not offer an opinion about the cause for the decline," but will just "present and explain the data." *Id.* at 17. From there, says Plaintiff, "the jury may infer that the slower decline of mesothelioma among women . . . reflects the prevalence of consumer talcum products well into the 2010s, whereas it has been decades since asbestos routinely was deployed in industrial settings." *Id.*

Because Plaintiff has walked away from the challenged graph prepared by Dr. Madigan, that graph is excluded along with any opinion concerning the cause for the "hold up" in the rate of decline in the SEER female mesothelioma data. This ruling does not extend to Dr. Madigan's discussion or presentation of the SEER data itself.

3.   *General causation*

Defendants request the exclusion of any opinion testimony by Dr. Madigan on general causation of mesothelioma, *i.e.*, that "there is sufficient evidence that lifetime asbestos exposures as found in regular use of cosmetic talc can cause or contribute to the development of pleural and peritoneal mesothelioma." Mot. Mem. at 17-18 (quoting Madigan Report of May 1, 2024, ¶ 23, ECF No. 82-11). In particular, Defendants flag the fact that two studies cited by Dr. Madigan involved samples with extremely high concentrations of asbestos fibers, whereas samples taken from MAS/Longo involve much lower concentrations. Plaintiff opposes the request with the observation that, among other things, Dr. Madigan's review of epidemiological studies will demonstrate that one can "quantif[y] the increased risk of mesothelioma as a function of total asbestos exposure as measured in fiber years." Pl. Opp'n at 19.

Based on my review of the record, I agree with Plaintiff that Dr. Madigan's general causation opinion would be of assistance to the jury where it is based on several peer-reviewed, epidemiological studies relating specialized knowledge concerning the risk of airborne asbestos exposure measured in fiber years, involves well-accepted principles and methods (*e.g.*, the Bradford Hill criteria), will help the trier of fact to understand the evidence or to determine a fact in issue, and is translatable and relevant to the facts of this case. Furthermore, as to the asserted differences in concentration levels, I am not convinced that there is no reliable fit between the several studies and the facts of this case and conclude that the alleged discrepancies present a question of weight that the jury will be able to assign with the benefit of cross-examination and input from opposing experts.

On the question of Dr. Madigan's expert qualifications, which Defendants challenge with redoubled effort in their Reply, I am not persuaded that Dr. Madigan needs to be an expert in the areas of asbestos carcinogenesis, asbestos mineralogy, or TEM Microscopy to confer upon the jury findings contained in epidemiological literature concerning the risk of asbestos inhalation. I recognize that Dr. Madigan does not have a degree in epidemiology. However, he reports that he has "more than 25 years of experience working in epidemiology" and that he is "an expert in many areas of epidemiology." Madigan Report of May 1, 2024, ¶ 3. Additionally, he has "published extensively in epidemiology journals[,] conducted and/or participated in many epidemiological studies[, and] consulted for many clients on epidemiological matters." *Id.* Based on the record, I conclude that Dr. Madigan possesses the requisite "knowledge" and "experience" to speak on the topic at issue. Fed. R. Evid. 702.

34

**G.** **DEFENDANTS' MOTION TO STRIKE AFFIDAVITS AND SUPPLEMENTAL PRODUCTION**

In connection with the preceding motions, Plaintiff attached to his opposition papers three affidavits that Defendants maintain should be stricken from the record for purposes of motion review and trial. Two of the challenged affidavits are the Affidavit of Lori Maxey (ECF No. 106-17) and the Affidavit of Sean Fitzgerald (ECF No. 106-20), both of which Plaintiff filed in opposition to Defendants' Motion to Exclude Expert Opinions of Sean Fitzgerald. The third is the Affidavit of John Godleski (ECF No. 105-2), which Plaintiff filed in opposition to Defendants' Motion to Exclude the Opinions of Dr. Godleski. Defendant asserts that the information disclosed in the affidavits include harmful evidentiary revelations that Plaintiff was required to disclose before the close of discovery. Defs. Mot. (ECF No. 118); Defs. Mot. Mem. (ECF No. 118-1).

Rule 26 of the Federal Rules of Civil Procedure and the Court's Scheduling Order required that the parties provide each other with initial disclosures. The parties must also supplement or correct a disclosure in a timely manner if the disclosure was incomplete or incorrect. Fed. R. Civ. P. 26(e). If the supplemental disclosure involves expert testimony, the party has until 30 days before trial, unless the court has otherwise ordered. Fed. R. Civ. P. 26(a)(3)(B) & (e)(2). The failure to comply may subject belatedly disclosed information or witnesses to exclusion. Fed. R. Civ. P. 37. According to Rule 37, "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Rule 37 also affords the Court leeway to impose a lesser sanction where

appropriate. Fed. R. Civ. P. 37(c). Whether a party's witnesses and exhibits should be excluded based on a failure to timely disclose is not, in the final analysis, "a strictly mechanical exercise." *Santiago–Diaz v. Laboratorio Clinico Y De Referencia Del Este,* 456 F.3d 272, 276 (1st Cir. 2006). "[D]istrict courts have broad discretion in meting out . . . sanctions for Rule 26 violations." *Laplace–Bayard v. Batlle,* 295 F.3d 157, 162 (1st Cir. 2002) (citation omitted). Factors that guide the exercise of discretion include (1) the history of the litigation; (2) the sanctioned party's need for the precluded evidence; (3) the sanctioned party's justification (or lack of one) for its late disclosure; (4) the opponent-party's ability to overcome the late disclosure's adverse effects (e.g., the surprise and prejudice associated with the late disclosure); and (5) the late disclosure's impact on the district court's docket. *Esposito v. Home Depot U.S.A., Inc.,* 590 F.3d 72, 78 (1st Cir. 2009).

### 1. Ms. Lori Maxey

Ms. Maxey is Ms. Cartwright's younger sister. According to the challenged affidavit, the two sisters were close enough in age for Ms. Maxey to recall things about Ms. Cartwright's household habits. In his initial disclosures, Plaintiff disclosed himself and his daughters as persons with knowledge of Ms. Cartwright's use of JBP. Immediately thereafter, he disclosed Ms. Maxey and her father but described them as persons with information concerning Ms. Cartwright's "family history" without specifically stating that they might know something about Ms. Cartwright's early use of JBP before she was married. Pl.'s Init. Discl. at 4 (ECF No. 117-1).

36

In connection with the Motion to Exclude Expert Opinions of Sean Fitzgerald, Defendant argues that JBP manufactured from talc mined in Italy has minimal if any relevance to this case because Ms. Cartwright's use began in the late 1970s after Johnson & Johnson transitioned from Italian talc to Vermont talc (with the notable exception of the year 1979, which involved a limited run of Italian talc). In opposition to that argument, Plaintiff offered Ms. Maxey's affidavit, in which she attests that Ms. Cartwright began to use JBP "during her preteen years," meaning during the late 1960s to early 1970s, when JBP was sourced from Italian talc. Maxey Aff. ¶¶ 9. I did not mention Ms. Maxey in my discussion of the Motion to Exclude because I did not consider the revelation to be determinative or material to the Motion, given the probabilistic existence of asbestos in all metamorphic talc deposits (regardless of source country) and the use of Italian talc in 1979. In part for this reason, I am not now impressed by the supposed harmfulness of this recent disclosure. Additionally, Plaintiff has divulged that he told Defendants during his deposition, in June 2025, that Ms. Maxey was someone who might know about Ms. Cartwright's use of JBP in her shoes. Pl. Opp'n at 4-5 (ECF No. 123). I appreciate that the parties have a lot to keep track of for purposes of this litigation, but I fail to find the multi-stage revelation about Ms. Maxey's awareness of matters that went on in Ms. Cartwright's childhood home to rise to the level of a sanctionable discovery violation and decline the request to strike Ms. Maxey's affidavit.

### 2. Mr. Fitzgerald

In response to Defendants' chain-of-custody challenge to the JBP samples that Mr. Fitzgerald tested, Plaintiff filed the Affidavit of Sean Fitzgerald in which he explains the

tamper-proof nature of the bottles and provides other information about the origin of his samples. Additionally, although not material to Plaintiff's opposition to the Motion to Exclude the Expert Opinions of Sean Fitzgerald, Plaintiff produced some files associated with Mr. Fitzgerald's testing of samples "from prior engagements." Pl. Opp'n at 6.

As for the affidavit statements concerning sample origins, I agree with Plaintiff that the origin or chain-of-custody concern was a matter that Defendant could have addressed during Mr. Fitzgerald's deposition. The fact that Mr. Fitzgerald addressed the issue in opposition to a Rule 702 challenge is a meaningful and timely disclosure for purposes of an expert witness disclosure, coming well in advance of 30 days before trial.

As for the belated production of files connected with prior engagements, Plaintiff has stated that he "does not care about these old materials and has no plan to use them at trial." Opp'n at 6. For the sake of finality, Plaintiff (but not Defendants) is precluded from introducing these materials at the trial. Exclusion of the materials is a sufficient "sanction" under the circumstances.

### 3. Dr. Godleski

In its Memorandum in Support of its Motion to Exclude Dr. Godleski's Causation Opinion (ECF No. 86), Defendants assert that Dr. Godleski's opinion is flawed because he found only evidence of talc in Ms. Cartwright's tissue and "Dr. Godleski admits that his report 'does not identify any scientific literature that demonstrates through a reliable scientific method that a higher talc tissue burden is associated with an increased risk of mesothelioma.'" *Id.* at 4 (quoting Godleski Dep. at 63:9-14 (ECF No. 86-1)). To that point, Plaintiff filed his Opposition, to which he attached the Affidavit of John J. Godleski,

38

M.D. (ECF No. 105-2).  Therein, Dr. Godleski observed that he did identify scientific literature demonstrating that talc is contaminated with asbestos as a function of geology and mineralogy, pointing to four articles previously disclosed, and he further offered "more documentation" consisting of five "additional references." *Id.* ¶ 14.

Defendants now seeks to foreclose Dr. Godleski from making any reference to the five additional references designed to supplement his report.  Defendants say that they would have cross-examined Dr. Godleski about these references had they been disclosed. Plaintiff argues that this challenge relies on manufactured prejudice because several of the additional sources cited by Godleski are listed in the reports of Defendants' own experts and both they and the other sources are well known in the asbestos litigation arena. Ultimately, I am not persuaded by the need for an exclusionary sanction in regard to the additional references identified in opposition to the Motion to Exclude.  As it stands, I did not find the presence or absence of the additional references to be key to the outcome of the Motion.  And for purposes of trial, I am persuaded that the parties-through-counsel and all of the expert witnesses who draw on or dispute these references, are sufficiently familiar with them that Dr. Godleski's inclusion of them in his own reference list is fair game for purposes of policing pretrial expert disclosures.

### 4. Fees

The parties competing requests for an award of a fee-shifting sanction for their unnecessary efforts in regard to this particular Motion are denied.

**H.    PLAINTIFF'S MOTION FOR LEAVE TO CONDUCT DE BENE ESSE DEPOSITIONS**

Plaintiff has requested of Defendants that they stipulate to the admissibility of testimony that Dr. Longo gave as an expert witness in another case and testimony that Andreas Saldivar gave as an expert witness in another case. Both men live outside this District and neither is a designated expert in this case. Dr. Longo at this point needs no further introduction. Plaintiff states that he needs testimony from Dr. Longo to support his cross-examination of Dr. Sanchez, based on the line of argument presented in the Motion to Exclude Expert Testimony of Dr. Matthew Sanchez, above. The testimony concerns "certain electron microscopy photographs of raw asbestos fibers" taken by his lab. Pl. Mot. at 1 (ECF No. 122). Defendants have declined to stipulate to the admissibility of the testimony. Andreas Saldivar is a former expert witness for Johnson & Johnson. Plaintiff states that Mr. Saldivar's lab, under contract with the FDA, detected asbestos in JBP in 2019. *Id.* at 2. Plaintiff asked Defendants to stipulate to the admissibility of an excerpt of Mr. Saldivar's deposition testimony in another matter, but Defendants declined. Plaintiff seeks leave to conduct video depositions of Dr. Longo and Mr. Saldivar to capture their prior testimony and present it to the jury in this matter. Plaintiff argues that a grant of leave would have the added benefit of enabling Defendants to cross-examine Dr. Longo in support of Defendants' effort to undercut the opinion testimony of Mr. Fitzgerald and Dr. Madigan, who have considered certain of Dr. Longo's other findings in support of their testimony. *Id.* at 3. Finally, Plaintiff seeks leave to depose Lori Maxey, Ms. Cartwright's sister, because she lives in Michigan and may have scheduling challenges related to appearing as a witness at trial. *Id.* at 4.

40

Defendants oppose the Motion, arguing that Plaintiff is seeking to reopen discovery, which closed in November 2025 after repeated extensions, and observing that Plaintiff did not provide any legal briefing in support of the Motion.  Def. Opp'n at 1-2, 6 (ECF No. 134).  Defendants assert that the request is premised on Rule 32, which exhibits a preference for live testimony, and argue that Rule 32 does not support Plaintiff's requests or justify new discovery initiatives.  *Id.*  at 3-5.

Unlike some districts, the District of Maine has not drawn distinctions between discovery depositions and trial depositions in its Local Rules or its standard scheduling order.  In terms of precedent, Magistrate Judge Rich appears to be the only judge to address the matter in writing, on two occasions.  *See 165 Park Row, Inc. v. JHR Dev., LLC*, No. 2:12-cv-106-NT, 2013 WL 5797363, at *1 (D. Me. Oct. 28, 2013); *Shannon v. Sasseville*, No. 2:08-cv-343-DBH, 2009 WL 3711484, at *1 (D. Me. Nov. 3, 2009).  In both matters, Judge Rich allowed trial depositions after the close of discovery, concluding that the discovery deadline found in the Court's scheduling order was not intended to govern trial depositions.  *165 Park Row* at *2; *Shannon* at *2.  Still, Rule 32, which governs depositions, offers some standards.  According to Judge Rich, his approach conformed to the majority approach. *165 Park Row* at *2.  According to a leading commentator on the Rules, however, the majority approach is to the contrary.  Steven S. Gensler, Federal Rules of Civil Procedure, Rules and Commentary § 30:3 (Westlaw 2025).

The goal is not to join the majority so much as to construe the Rules to secure "the just, speedy, and inexpensive determination of every action and proceeding."  Fed. R. Civ. P. 1.  In the exercise of its inherent powers, a court should seek "to achieve the orderly and

41

expeditious disposition of cases." *Dietz v. Bouldin*, 579 U.S. 40, 45 (2016) (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630-31 (1962)). Here, absent a rule or statute that prohibits the allowance of the requested trial depositions, a resolution will be proper if it provides a "'reasonable response to the problems and needs' confronting the court's fair administration of justice." *Id.*

Relative to this particular action, the taking of trial depositions does not present any special concern involving expense. Plaintiff volunteers to absorb the expense of trial depositions and the Defendants, at least in relation to the experts in question, have passed on Plaintiff's invitation to stipulate to the admissibility of transcribed testimony provided in other cases to avoid the need for trial depositions. Given this presentation, the reasonable resolution to Plaintiff's request should not be based on expense. As for a speedy determination, I find this consideration is, similarly, not a driving force. The trial date has yet to be set and the parties have advised the Court that they will be presenting non-expert in limine motions and briefs throughout the month of May (the briefing is only now wrapping up). As proposed, the expert trial depositions should not cause this case to be any less speedily determined. That leaves the interests in a just determination and the orderly administration of the trial process, which I consider as encompassing fairness to the parties, the Court, and the jury.

This case is but one individual case soon to take place on a stage that is already populated with several familiar supporting cast members and set pieces, including some expert witnesses whose lines and reports are already written. Plaintiff's desire to have Dr. Longo and Mr. Saldivar voice their own lines by means of two focused trial depositions is

conducive to a just proceeding, meaning one that is more likely to come through with greater factual resolution (for both sides) and, most importantly, for the jury.  For this reason, I grant leave for the taking of trial depositions of Dr. Longo and Mr. Saldivar, provided that the depositions are limited to the subjects outlined in Plaintiff's Motion. More specifically, the depositions must be video recorded to preserve a trial-like presentation concerning the identified matters upon which the experts have already testified; to wit:

Dr. Longo may be deposed for purposes of trial on the subject of "certain electron microscopy photographs of raw asbestos fibers," consistent with the deposition testimony he previously provided in *Lee v. Bi-Mart Corp*, concerning deposition exhibit 480, as highlighted by Plaintiff in Motion Exhibit 2 (ECF No. 122-2).  Should they so choose, Defendants are granted leave to question Dr. Longo consistent with the challenges they made to the reliability of the methodology he employed when examining samples of JBP, as outlined in their motions to exclude Dr. Madigan and Mr. Fitzgerald.

Mr. Saldivar may be deposed for purposes of trial on the subject of his lab's alleged detection of asbestos in JBP while operating under contract with the FDA in 2019, consistent with the extent of the deposition conducted in *Zimmerman v. Autozone*, Motion Exhibit 3 (ECF No. 122-3).

As for the proposed trial deposition of Ms. Maxey, which is based on Plaintiff's assertion that Ms. Maxey may have difficulty attending the trial, depending on the date, that request for a trial deposition is denied.  Rule 32 states rather clearly the preference for live testimony at trial.  Ms. Maxey is a member of Plaintiff's family and there is no reason

to anticipate that she would refuse to appear or that the circumstances would meet any of

the other limited factors that would support a finding that she is an "unavailable" witness.

*See* Fed. R. Civ. P. 32(a)(4)(A)-(E).

## CONCLUSION

Defendants' Motion in Limine to Exclude the Opinions of Dr. Godleski (ECF No. 73) is DENIED.

Plaintiff's Motion to Exclude Cumulative and Irrelevant Expert Opinion Testimony (ECF No. 75) is DENIED.

Plaintiff's Motion to Exclude Expert Causation Opinions Related to Cynthia Cartwright's Worksites (ECF No. 78) is GRANTED IN LIMITED PART AND OTHERWISE DENIED.   Defendants' experts are not allowed to offer specific causation opinions predicated on worksite exposure.

Plaintiff's Motion to Exclude Expert Testimony of Dr. Matthew Sanchez (ECF No. 81) is DENIED.

Defendants' Motion to Exclude Certain Opinions of Dr. David Madigan (ECF No. 82) is GRANTED IN LIMITED PART AND OTHERWISE DENIED.  Dr. Madigan will not offer opinion testimony in the form of the challenged graph or concerning the cause for the alleged "hold up" in the rate of decline reflected in the SEER female mesothelioma data.

Defendants' Motion to Exclude Expert Opinions of Mr. Sean Fitzgerald (ECF No. 83) is DENIED.  However, on the topic of asbestos inhalation, Mr. Fitzgerald's glovebox results will be limited to filters located at a height that is above the application level.

Defendants' Motion to Strike (ECF No. 118) is GRANTED IN LIMITED PART AND OTHERWISE DENIED.  Plaintiff will not introduce or discuss on direct examination any evidence or opinion concerning Mr. Fitzgerald's belatedly produced files concerning prior engagements/old materials.

Plaintiff's Motion for Leave to Conduct De Bene Esse Depositions (ECF No. 122) is GRANTED IN PART AND DENIED IN PART.  Leave is granted exclusively as to the topics identified above in connection with the request for leave to depose Dr. Longo and Mr. Saldivar.  Leave is not granted as to Ms. Maxey.

The Motions for Leave to File Surreplies (ECF Nos. 119, 120, 124) are GRANTED.

44

SO ORDERED.

Dated this 23rd day of June, 2026.

/s/ Lance E. Walker
Chief U.S. District Judge